UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| EDDIE'S TRUCK CENTER, INC,  FOUR OPEN A TRUCKS, INC, <br><br> Plaintiffs, <br><br> vs. <br><br> DAIMLER VANS USA LLC, MERCEDEZ-BENZ USA LLC, <br><br> Defendants. | 5:21-CV-05081-VLD <br><br> MEMORANDUM OPINION AND ORDER |

## INTRODUCTION

This matter is before the court on the complaint of plaintiffs Eddie's Truck Center, Inc. ("Floyd's Rapid City" [1]) and Four Open A Trucks, Inc. ("Floyd's Belgrade") alleging damages caused by defendants' Daimler Vans USA LLC ("DVUSA") and Mercedes-Benz USA, LLC ("MBUSA") violation of SDCL § 32-6B-45 and Mont. Code Ann. § 61-4-205(1).  See Docket No. 1.  This court has original jurisdiction over this matter under 28 U.S.C. § 1332 because of the diversity of citizenship of the parties and the amount in controversy.

---

[1] Plaintiffs' "doing business as" name is Floyd's Truck Center.  Because both parties used "Floyd's Rapid City" and "Floyd's Belgrade" to describe the plaintiffs, the court will do so as well.

Pending is defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  See Docket No. 44.  Plaintiffs oppose this motion. See Docket No. 59.

## FACTS

This case arises out of defendants' termination of franchise and service agreements with its authorized dealers, Floyd's Rapid City and Floyd's Belgrade, when defendants allegedly ended the distribution of the Freightliner Sprinter vehicle.

Floyd's Rapid City, a motor vehicle dealer located in Rapid City, South Dakota, entered into a Commercial Vehicle Dealer Agreement with DVUSA which granted Floyd's Rapid City a franchise to sell and service new Freightliner Sprinter motor vehicles and to use the Sprinter trademark.  Docket No. 1, ¶ 1.  Both MBUSA and DVUSA distributed Sprinter commercial vans to dealers that each of them enfranchised.  Id. ¶¶ 24-26.  The vans that MBUSA and DVUSA distributed were nearly identical and bore the same "Sprinter" trademark and logo.  Id. ¶ 28.  Floyd's Rapid City's franchise agreement was with DVUSA only.  Id. ¶¶ 18-19.  DVUSA is a wholly owned subsidiary of MBUSA, and MBUSA completely controls DVUSA's business operations.  Id. ¶ 15.

In August 2020, DVUSA notified Floyd's Rapid City that the manufacturer of the Freightliner Sprinter "decided to discontinue distribution" of the vehicle in the United States market "with production to cease in September 2021 and all new retail sales to be completed no later than

December 31, 2021." Docket No. 47-1. In September 2021, DVUSA sent notice to Floyd's Rapid City confirming that their dealer agreement would be terminated effective December 31, 2021. Docket No. 1, ¶ 44; Docket No. 45, p. 3. Plaintiffs contend that MBUSA (DVUSA's parent company), continues to distribute nearly identical Sprinter vans using the same Sprinter trademark Docket No. 1 at ¶¶ 45-46.

Floyd's Rapid City asserts that defendants' termination of the dealership agreement violated SDCL § 32-6B-45 because the termination was made without "good cause" and Floyd's Rapid City substantially complied with the essential and reasonable requirements of the agreement. Docket No. 1, ¶ 58. Floyd's Rapid City also asserts that "Sprinter vehicles will continue to be sold by MBUSA for resale to other Sprinter dealers, including other Freightliner dealers currently enfranchised by DVUSA." Docket No. 1, ¶ 45.

Floyd's Belgrade, a motor vehicle dealer located in Belgrade, Montana, entered into a separate service provider agreement with DVUSA that authorized Floyd's Belgrade to service Freightliner Sprinter vehicles and purchase parts, accessories, and tools. See Docket No. 47-2. This service provider agreement states that "[Floyd's Belgrade] does not, by this Agreement, acquire any rights to engage in the sale of new Mercedes-Benz or Freightliner passenger vehicles or commercial vehicles." Docket No. 47-2, ¶ 22. The agreement had an automatic expiration date of July 1, 2021, but DVUSA extended the agreement through the earlier of either October 31, 2021, or the execution of a new agreement. See Docket No. 47-3.

In October 2021, DVUSA sent notice to Floyd's Belgrade saying that:

> i)The 2018 [agreement] will be extended through December 31, 2021; ii) Effective December 31, 2021, the 2018 [agreement] will be terminated due to the discontinuation of the Freightliner Sprinter; and iii) For the period commencing January 1, 2022 and ending December 31, 2026, Floyd's shall be authorized to continue with the activities authorized by, and under the terms of, the 2018 [agreement].

Id. Floyd's Belgrade asserts that defendants' termination and refusal to continue their service agreement is without "good cause" in violation of Mont. Code. Ann. § 61-4-205.

Defendants now move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  See Docket No. 44.  Plaintiffs oppose this motion.  See Docket No. 59.

## DISCUSSION

### A.   Standard Applicable to FED. R. CIV. P. 12(c) Motion

This court recently addressed the proper standard applicable to motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c):

> Courts deciding a Rule 12(c) motion are required to accept as true the well-pled allegations and must resolve all inferences in the non-moving parties' favor.  Wishnatsky v. Rovner, 433 F.3d 608, 610 (8th Cir. 2006).  However, this tenet does not apply to legal conclusions, "formulaic recitation of the elements of a cause of action," or factual assertions which are so indeterminate as to require further factual enhancement.  Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009). . . .  When considering a motion for judgment on the pleadings, a court generally must ignore all materials outside the pleadings.  Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).  However, courts may consider "some materials that are part of the public record or do not contradict the complaint . . . as well as materials that are necessarily embraced by the pleadings."  Id.

4

Union Ins. Co. v. Scholz, 473 F. Supp. 3d 978, 982 (D.S.D. 2020).  The main difference between a motion to dismiss under Rule 12(b)(6) asserting plaintiff has failed to state a claim and a motion under Rule 12(c) is timing: a Rule 12(b)(6) motion must be made before an answer is filed while a Rule 12(c) motion can be made after the pleadings have closed.  Id. at 981.

A motion for judgment on the pleadings under FED. R. CIV. P. 12(c) is "appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law."  Ashley County, Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009) (quoting Wishnatsky, 433 F.3d at 610.  "In considering a motion under [Rule 12(c)], it is analyzed under the same rubric as that of a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted."  Flandreau Santee Sioux Tribe v. Gerlach, 162 F. Supp. 3d 888, 891 (D.S.D. 2016).  "The facts alleged in the complaint must be enough to raise a right to relief above the speculative level."  Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009) (quoting Drobnak v. Andersen Corp., 561 F.3d 778, 783 (8th Cir. 2009) (internal quotations omitted)).

In diversity cases, the substantive law of the state—here, South Dakota and Montana—applies to determine the rights and obligations of the parties while federal rules of procedure are applied.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); In re Baycol Products Litigation, 616 F.3d 778, 785 (8th Cir. 2010).  Where the state courts have not addressed a particular legal issue, the federal court must attempt to predict how the state's highest court

5

would decide the issue and proceed accordingly.  Lindholm v. BMW of N. Am., LLC, 862 F.3d 648, 651 (8th Cir. 2017).

**B.      Floyd's Rapid City's Claim**

Floyd's Rapid City brought a claim for damages pursuant to SDCL § 32-6B-45 caused by defendants' alleged wrongful termination of their franchise agreement.  Docket No. 1.  Floyd's Rapid City asserts that defendants' termination of the franchise based on a line-make discontinuation does not amount to "good cause" under SDCL § 32-6B-45.  Docket No. 59, p. 4. Defendants argue that the list of "good cause" reasons to terminate that are set forth in SDCL § 32-6B-45 are nonexclusive and that a line-make discontinuation constitutes "good cause" for termination of the franchise agreement as a matter of law.  Docket No. 45, p. 7.  Because the parties' arguments focus on SDCL § 32-6B-45, the court first turns to construction of that statute.

**1.      Statutes and Rules of Construction**

In South Dakota, "every contract contains an implied covenant of good faith and fair dealing that prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract." Schipporeit v. Khan, 775 N.W.2d 503, 505 (S.D. 2009) (citations omitted). "Good faith" is defined in SDCL chapter 32-6B as "honesty in fact and the observance of reasonable, nondiscriminatory commercial standards of fair dealing in the trade."  SDCL § 32-6B-1(16).  A "franchise" is defined as "a written or oral agreement or contract between a franchisor and franchisee that

6

fixes the legal rights and liabilities of the parties to the agreement or contract."
SDCL § 32-6B-1(13).

Any person who wants to sell new vehicles in South Dakota must apply
for a license from the state; a prerequisite to the issuance of such a license is a
franchise agreement between the dealer and the manufacturer of the vehicles
to be offered for sale.  SDCL §§ 32-6B-6, 32-6B-10.  There are certain terms
and conditions that South Dakota law prohibits inserting into new vehicle
franchise agreements (SDCL § 32-6B-49.1); otherwise, "parties to a contract
are free to construct their agreement and understanding as they see fit --
except for those contracts which violate the law or public policy."  Int'l
Multifoods Corp. v. Mardian, 379 N.W.2d 840, 844 (S.D. 1985).

Floyd's Rapid City's claim is premised on SDCL § 32-6B-45, which
provides:

> No franchisor may . . . terminate, cancel, fail to renew, or
> substantially change . . . a vehicle dealership agreement without
> good cause.  For the purposes of this section, good cause means
> failure by a vehicle dealer to substantially comply with essential
> and reasonable requirements imposed upon the vehicle dealer by
> the vehicle dealership agreement,  if the requirements are not
> different from those requirements imposed on other similarly
> situated vehicle dealers by their terms.  If addition, good cause
> exists if:
>
> (1) Without the consent of the vehicle manufacturer, the vehicle
> dealer has transferred an interest in the vehicle dealership, there
> has been a withdrawal from the dealership of an individual
> proprietor, partner, major shareholder, or the manager of the
> dealership, or there has been a substantial reduction in interest of
> a partner or major stockholder;
>
> (2) The vehicle dealer has filed a . . . petition in bankruptcy . . .
> there has been a closeout or sale of a substantial part of the

dealer's assets . . . or there has been a . . . dissolution or liquidation of the dealer;

(3) There has been a change, without the prior written approval of the manufacturer, in the location of the dealer's principal place of business . . .;

(4) The vehicle dealer has defaulted under a security agreement between the dealer and the vehicle manufacturer or there has been a revocation or discontinuance of a guarantee . . .;

(5) The vehicle dealer has failed to operate in the normal course of business for seven consecutive days or has . . . abandoned the business;

(6) The vehicle dealer has pleaded guilty to or been convicted of a felony affecting the relationship between the dealer and the manufacturer;

(7) The dealer has engaged in conduct which is injurious or detrimental to the dealer's customers or to the public welfare; or

(8) The vehicle dealer, after receiving notice from the manufacturer of its requirements for reasonable market penetration based on the manufacturer's experience in other comparable marketing areas, consistently fails to meet the manufacturer's market penetration requirements.

A vehicle manufacturer shall provide a vehicle dealer at least ninety days prior written notice of termination, cancellation, or nonrenewal of the dealership agreement.  The notice shall state all reasons constituting good cause for the action and shall provide that the dealer has sixty days in which to cure any claimed deficiency.  If the deficiency is rectified within sixty days, the notice is void.  The notice and right to cure provisions under this section do not apply if the reason for termination, cancellation, or nonrenewal is for any reason set forth in subdivisions (1) to (7), inclusive.

See SDCL § 32-6B-45.

    South Dakota law provides that any violation of § 32-6B-45 gives rise to

the right by a franchisee to bring a civil action to recover damages as well as

costs, disbursements, and reasonable attorney's fees.  See SDCL § 32-6B-86.

Again, in diversity cases, the substantive law of the state—South Dakota—applies to determine the rights and obligations of the parties while federal rules of procedure are applied.  See Erie R.R. Co., 304 U.S. at 78. "Statutory interpretation is substantive rather than procedural because it concerns the meaning and application of state substantive law."  Pitman Farms v. Kuehl Poultry, LLC, 48 F.4th 866, 875 (8th Cir. 2022) (citing Behlmann v. Century Sur. Co., 794 F.3d 960, 963 (8th Cir. 2015) ("Interpreting state statutes, this court applies that state's rules of statutory construction.")). Thus, this court will follow South Dakota's rules of statutory construction to interpret SDCL § 32-6B-45.

The first sentence of this statute provides that "good cause" is required to terminate a franchise agreement.  SDCL § 32-6B-45.  The question presented by Floyd's Rapid City's claim is whether the list of eight factors contained in § 32-6B-45 constitute the exclusive grounds for termination of a franchise agreement.  There is no South Dakota case law that has addressed this precise issue before the court.

This court holds that the eight factors listed in § 32-6B-45 are not exclusive for three reasons.  First, the actual language of the statute supports such an interpretation.  Second, interpreting § 32-6B-45 as containing a nonexclusive list of good cause reasons for termination avoids rendering other statutes, specifically § 32-6B-49, superfluous.  And, finally, interpreting the statute as setting forth a nonexclusive list of "good cause" reasons for termination of franchise agreements avoids a potential constitutional problem.

9

## 2.   SDCL § 32-6B-45 Contains a Nonexclusive List of Good Cause Reasons for Terminating a Franchise

### a.   The Language of the Statute Itself

The first sentence of § 32-6B-45 is instructive—"No franchisor may . . . terminate, cancel, fail to renew, or substantially change . . . a vehicle dealership agreement without good cause." If the list of eight factors used in this statute were exclusive, there would be no need to state that termination must be for "good cause." The legislature could have simply written that franchise agreements may be terminated only for the eight circumstances stated in § 32-6B-45.

Floyd's Rapid City asserts that the legislative history of both SDCL § 32-6B-45 and SDCL § 32-6B-49 shows:

> (1)the South Dakota legislature originally intended to prohibit franchisors from terminating dealer agreements without cause and enacted several statutes addressing circumstances to be considered in evaluating whether good cause exists; (2) the South Dakota legislature intended to maintain the same prohibitions against terminations as reflected in the statutes as originally enacted in 1986 when it repealed SDCL § 32-6B-46, revised § 32-6B-45, and added a fifth factor to § 32-6B-49; and (3) the provisions of SDCL §§ 32-6B-45 through 32-6B-49 create a statutory scheme that progressively lays out a general prohibited act (termination without cause and establishment of additional dealership of same line make without cause) with complementary examples of specific circumstances that clarify when a prohibition occurs.

Docket No. 59, p. 10. The legislature's purpose, Floyd's Rapid City contends, "is to prohibit franchise terminations without good cause." Id. at 11.

But, as defendants point out, "32-6B-45 contains no exclusivity language." Docket No. 69 at p. 4. Therefore, defendants argue the statute

10

"cannot be read as defining the only allowable grounds for termination."   Id.
The court agrees.

South Dakota courts have held that without statutory language of
exclusion or inclusion, a list of reasons or factors in a statute should not be
considered to be an exhaustive list.  See Tracfone Wireless, Inc. v. S.D. Dep't of
Rev. & Reg., 778 N.W.2d 130, 135 (S.D. 2010).  Without exclusivity language, it
is reasonable to assume that the South Dakota legislature was merely
providing examples of when "good cause" exists to terminate a franchise, not
an exhaustive list of circumstances that must be present.  As Floyd's Rapid
City suggests, "where the language used in a statute is plain, the court cannot
read words into it that are not found therein either expressly or by fair
implication."  Docket No. 59, p. 11 (citing Matthews v. Linn, 99 N.W.2d 885,
887-88 (S.D. 1959)).

Floyd's Rapid City's claim that "defendants want this Court to read an
exception for line-make discontinuations into SDCL § 32-6B-45 that does not
exist," is also incorrect.  See Docket No. 59, p. 11.  The suggestion that if the
"South Dakota legislature wanted to create a line-make discontinuation
exception, it would have" is undercut by the fact that the South Dakota
legislature did not specify that the circumstances provided in SDCL § 32-6B-45
are an exhaustive list.  If the legislature had clearly stated that SDCL § 32-6B-
45 contains an exhaustive list, then this court would be creating an exception
for defendants by allowing terminations for line-make discontinuations.  But
that is not how the South Dakota legislature framed SDCL § 32-6B-45.

Without such exclusive language, courts must interpret what circumstances beyond those listed in the statute could be considered "good cause" for termination.

Floyd's Rapid City also relies on <u>Black Hills Truck & Trailer, Inc. v. MAC Trailer Mfg., Inc.</u>, No. 4:13-cv-04113, 2017 WL 4236546 (D.S.D. Sept. 22, 2017) (unpub'd), for the proposition that "if a manufacturer's stated reasons for terminating a dealer do not apply to the definition of 'good cause' as defined in [32-6B-45], the manufacturer's reasons do not amount to good cause and the termination violates [32-6B-45]."  Docket No. 59, p. 6 (citing <u>Black Hills Truck & Trailer</u>, 2017 WL 4236546, at *5).  Defendants assert that the holding in <u>Black Hills Truck & Trailer</u> is distinguishable because the issue before the court in that case was whether termination of a franchise agreement is permissible without formal notice, not whether a termination with notice based on line-make discontinuations was unlawful.  Docket No. 69, p. 5.

While the court in <u>Black Hills Truck & Trailer</u> did evaluate whether the manufacturer's termination complied with SDCL § 32-6B-45's notice requirement, it also determined that the manufacturer did not have "good cause" to non-renew Black Hills as a dealer.  <u>Black Hills Truck & Trailer</u>, 2017 WL 4236546, at *5 ("The court finds that, even if MAC's state reasons for terminating Black Hills were true, they do not amount to good cause as defined in subdivisions (1)-(7).").  But the court did not address whether a termination under circumstances not identified in SDCL § 32-6B-45, such as a line-make discontinuation, is unlawful—which is the essential issue before this court.

12

Floyd's Rapid City's claim that the Black Hills Truck & Trailer court held that "the only exception under SDCL § 32-6B-45 that exempts a manufacturer from the requirement to provide a dealer with notice and right to cure is if the termination is based on any of the circumstances described in the eight subdivisions enumerated therein," is inapposite. See Docket No. 59, p. 11. Notice and right to cure are not at issue in this case. The Black Hills Truck & Trailer court did not address whether termination under circumstances not listed in SDCL § 32-6B-45 is unlawful.

This court would also note that Black Hills Truck & Trailer dealt with a motion for summary judgment, or presumably after the parties had had ample time to conduct discovery. By contrast, defendants' motion for judgment on the pleadings has been made several months before the discovery deadline in this case.

Finally, the court points out that there is a legislative reason for the listing of the first seven items. No notice and opportunity to cure are available to a franchisee if the reason for the termination falls within one of these seven items. See SDCL § 32-6B-45. For all other grounds for termination—ground 8 or any other good cause reasons—the manufacturer must provide notice 90 days in advance and, if applicable, afford the franchisee the opportunity to cure the deficiency. The language of the statute itself demonstrates that the South Dakota legislature did not intend for the list of eight reasons in § 32-6B-45 to be exclusive.

### b. Section 32-6B-49 Would Be Rendered Superfluous by an Interpretation that the Eight Factors were Exclusive

SDCL § 32-6B-49 lists circumstances which are "not cause for the termination or noncontinuance of a franchise." Defendants argue that if § 32-6B-45 were the exclusive grounds for "good cause" termination, then § 32-6B-49 would be "surplusage" because "one statue cannot be interpreted to render another meaningless." Docket No. 69, p. 3 (citing Sentell v. Farm Mut. Ins. Co of Lincoln Cty., 956 N.W.2d 826, 835 (S.D. 2021)). In other words, defendants argue that if the list of "good cause" reasons for termination in § 32-6B-45 were exclusive, there would be no need for a separate list of "not good cause" grounds in § 32-6B-49—anything not appearing in the eight enumerated good cause reasons contained in § 32-6B-45 would necessarily not be good cause and there would be no reason to have a separate list of "bad cause" reasons.

Section 32-6B-49 provides as follows:

The following circumstances are not cause for the termination or noncontinuance of a franchise, nor for entering into a franchise for the establishment of an additional dealership in a community for the same line-make:

(1) The change of executive management or ownership by the franchisee, unless the franchisor can show that the change would be detrimental to the representation or reputation of the franchisor's product;
(2) Refusal by the franchisee to purchase or accept delivery of any motor vehicles or vehicles, parts, accessories, or any other commodity or service not ordered by said franchisee;
(3) The sole fact that franchisor desires further penetration of the market;
(4) The fact that the franchisee owns, has an investment in, participates in the management of, or holds a franchise for the sale of another line-make of vehicle, or that the franchisee has established another line-make of vehicle in the same dealership

14

> facilities as those of the franchisor, if the franchisee maintains
> a reasonable line of credit for each line-make of vehicle; or
>
> (5) Refusal by the dealer to participate in any advertising campaign
> or contest or purchase any promotional materials, display
> devices, or display decoration or materials which are at the
> expense of the dealer.

See SDCL § 32-6B-49.

If the South Dakota legislature intended that all "good cause" terminations must be among the eight circumstances listed in SDCL § 32-6B-45, then a separate statute (§ 32-6B-49) which lists examples of when a franchisor cannot terminate a dealer agreement would be superfluous. The South Dakota Supreme Court has consistently held that courts "should not adopt an interpretation of a statute that renders [another] statute meaningless when the Legislature obviously passed it for a reason." Peterson, ex rel. Peterson v. Burns, 635 N.W.2d 556, 567 (S.D. 2001) (citing Faircloth v. Raven Indus., Inc., 620 N.W.2d 198, (S.D. 2000)); see also Sentell, 956 N.W.2d at 835). Thus, this court cannot interpret SDCL § 32-6B-45 to contain an exclusive list of "good cause" circumstances when SDCL § 32-6B-49 separately sets forth reasons that are not good cause.

Floyd's Rapid City seeks to contradict this conclusion, arguing that these statutes should be considered "complementary" of one another. Docket No. 59, p. 6. But Floyd's Rapid City cannot have it both ways. They cannot suggest that SDCL § 32-6B-49 contains a list of "complementary examples," yet also insist that the examples listed in SDCL § 32-6B-45 are exhaustive. Docket No. 59, p. 10. The South Dakota legislature chose not to place exclusive language in either statute.

### c.   Interpreting the Eight Factors to be Exclusive Gives Rise to a Potential Constitutional Problem

Defendants argue that if the court were to interpret SDCL § 32-6B-25  as to eliminate a line-make discontinuation as potential good cause to terminate a franchise agreement, it could lead to a potential dormant commerce clause issue down the road.  Docket No. 69, p. 8.  Defendants assert that if state legislatures were to prohibit out-of-state manufacturers from terminating dealer agreements when their line-makes are discontinued, the legislatures would be burdening commerce outside their states and discriminating in favor of in-state business in violation of the dormant commerce clause.  Docket No. 45, p. 9.  The argument is colorable.

"The dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce." S.D. Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592 (8th Cir. 2003).  "A state law that is challenged on dormant Commerce Clause grounds is subject to a two-tiered analysis.  First, the court considers whether the challenged law discriminates against interstate commerce." Id. at 593 (citing Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994)).  "If the law is not discriminatory, the second analytical tier provides that the law will be struck down only if the burden it imposes on interstate commerce 'is clearly excessive in relation to its putative local benefits.' " Id. (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

Defendants' argument is best understood as an "as applied" challenge of SDCL § 32-6B-45, or whether preventing defendants under the facts of this

16

case from terminating franchises due to line-make discontinuation would impose excessive burdens on them.  "An as-applied challenge consists of a challenge to the statute's application only as-applied to [defendants]." Turtle Island Foods, SPC v. Thompson, 992 F.3d 694, 703 n. 5 (8th Cir. 2021) (quoting Republican Party of Minn., Third Cong. Dist. V. Klobuchar, 381 F.3d 785, 790 (8th Cir. 2004)).  "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." Id.  Because neither party provided analysis as to whether SDCL § 32-6B-45 is discriminatory, the court assumes, without so holding, that the statute is not discriminatory.  The court observes that the statute is facially neutral.  The court now turns to the second tier of the Pike balancing test.  Pike, 397 U.S. at 142.

Floyd's Rapid City argues that SDCL §§ 32-6B-45 and 32-6B-49 protect a legitimate local public policy interest by ensuring that South Dakota franchises are not terminated for unjust reasons and "provid[es] a remedy when their franchises are terminated." Docket No. 59, p. 14.  This court has held that "South Dakota has a fundamental public policy interest in protecting its franchisees." See Black Hills Truck & Trailer, Inc. v. Mac Trailer Mfg., Inc., No. 4:13-cv-04113-KES, 2015 WL 8483353, *2 (D.S.D. Dec. 9, 2015).  Without statutory protections for franchisees, both in-state and out-of-state manufacturers could avoid contractual agreements easily, leaving dealers without any recourse or remedy.

17

But if the court were to adopt plaintiffs' interpretation of SDCL § 32-6B-45—granting *per se* relief to South Dakota dealers when an out-of-state manufacturer ceases production of a certain line-make of vehicle—it *could* impose "clearly excessive [burdens on interstate commerce] in relation to its putative local benefits." Pike, 397 U.S. at 142. First, no Freightliner Sprinter or Mercedes-Benz vehicles are manufactured in South Dakota, so the effect of the statute on defendant manufacturers is exclusively felt by out-of-state manufacturers. Second, line-make discontinuations are common in the automotive industry—the shifting market and economy, change in demand for certain vehicles, and new technology could lead automotive manufacturers to discontinue the production and sale of certain vehicle line-makes. Emerging evidence of dangerous design defects may also cause a manufacturer to discontinue a particular line-make. If this court were to read into SDCL § 32-6B-45 a prohibition against terminating franchise agreements due to line-make discontinuation, it *could* unfairly prejudice defendants and automotive manufacturers like them.

While the court agrees with Floyd's Rapid City that there are legitimate public policy interests in protecting South Dakota franchisees, preventing out-of-state automotive manufacturers from terminating franchises due to a line-make discontinuation *could* impose excessive burdens on the manufacturers in violation of the dormant commerce clause—for example, by forcing the continued manufacture of an unsafe vehicle or a vehicle that is not profitable, or having to pay franchisees when a line-make is discontinued for one of these

18

reasons.  As both parties address, several states have separate statutes on regulating line-make discontinuations and when, or if, dealers are entitled to remedies.  See Fla. Stat. § 320.64(36)(b); Mass. Gen. Laws ch. 93B, § 5(k); Mich. Comp. Laws § 445.1571(3); Ohio Rev. Code Ann § 4517.541, .542; 63 Pa. Stat. § 818.313; Tex. Occ. Code Ann. § 2301.4651; Wis. Stat. § 218.0132.

But the South Dakota legislature has not specifically provided any such relief for South Dakota dealers in the context of a line-make discontinuation. Without the legislature having specifically addressed this issue, the court finds it prudent to interpret the statute at issue in a way that avoids a constitutional problem.  See Phelps-Roper v. Ricketts, 867 F.3d 883, 901 n.2 (8th Cir. 2017) ("Courts will interpret statutes to avoid constitutional issues.").

For all the above reasons—language of the statute itself, interpretation of the statute with other statutes in the same chapter, and the potential dormant commerce clause problem—the court concludes that § 32-6B-25 does not contain an exclusive list of factors constituting good cause for the termination of a new motor vehicle franchise agreement.  Nevertheless, the court does not grant defendants' motion as to Floyd's Rapid City's claim.

### 3.    Judgment on the Pleadings is Not Proper

Implicit in defendants' argument is the assertion that discontinuation of a line-make is *per se* "good cause" for terminating the franchise with Floyd's Rapid City.  The court does not agree.  Good cause is defined in chapter 32-6B in terms of reasonableness (see SDCL § 32-6B-1(14)), and questions of reasonableness are usually reserved for the jury.  See Carlson v. Construction

19

Co., 761 N.W.2d 595, 599 (S.D. 2009) ("reasonable person standard . . . is determined by the evidence and decided by the jury."). Therefore, even if the issue of whether defendants legitimately did discontinue the Freightliner Sprinter line-make were undisputed (it is not), it is not clear that the discontinuation constitutes reasonable cause for terminating the franchise as a matter of law in this case.

Defendants' citation to Cent. GMC, Inc. further supports this court's conclusion.  Cent. GMC, Inc. v. General Motors Corp., 946 F.2d 327 (4th Cir. 1991).  This Fourth Circuit case relied in part on the manufacturer's motives in discontinuing the line-make—economic necessity given falling sales and plummeting profitability.  Here, nothing is known about defendants' reasons for discontinuing the Freightliner Sprinter line-make orif they did so. If the motivation was because Freightliner Sprinter sales were incredibly lucrative and they wanted to keep the profits in-house, that would be a very different motivation than if the Sprinter saw decrease in demand like General Motors saw in the Cent. GMC, Inc. case.  In any event, motivations for the decision to discontinue the line-make (if it happened) are unknown and could have an outsize impact on the reasonableness inquiry.

Second, neither party has enlightened the court as to what the terms of their franchise agreement provide.  What does the contract provide as to grounds and procedures for terminating the agreement?  What is the duration or term of the contract, if any?  What remedies are provided under the contract?  As indicated above, the parties can fashion any contract terms they

20

desire as long as those terms are not contrary to law.  See Int'l Multifoods Corp. 379 N.W.2d at 844.  The contract, first and foremost, determines the rights of the parties and the statutes play a secondary role only if the contract or the parties' actions are contrary to a statute.  Without knowledge of the terms of the contract, the court cannot say with certainty that defendants are entitled to judgment as a matter of law.

Third, non-speculative factual issues—aside from reasonableness—exist which prevent the issuance of judgment on the pleadings.  Again, the question before the court given the procedural posture of defendants' motion under Rule 12(c) is whether "there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law."  Ashley County, Ark., 552 F.3d at 665.

Floyd's Rapid City argues that there is a genuine factual question whether defendants' stated reason (discontinuation of the Freightliner Sprinter line-make) is the real reason for the termination of  its franchise agreement.  Floyd's Rapid City also maintains that there is a factual issue as to whether defendants in fact did discontinue the Freightliner Sprinter line-make.  Docket No. 59 at pp. 11-12, 14.  Plaintiffs' complaint specifically alleges that after termination of plaintiffs' franchise agreements, "Sprinter vehicles will continue to be sold by MBUSA for resale to other Sprinter dealers, including other Freightliner dealers currently enfranchised by DVUSA to buy Sprinter vehicles for resale."  Docket No. 1, ¶ 45.

Defendants attempt to dispute Floyd's Rapid City's disputed issue of fact as to whether a vehicle line-make was discontinued.  See Docket No. 69, p. 4 n. 2.  Defendants present non-binding authority from other districts, arguing that the South Dakota Supreme Court "would follow the ample authority holding that the Freightliner Sprinter is a distinct line-make."  Id.  But, whether a line-make discontinuation occurred is not the only factual dispute Floyd's Rapid City presents.  They also dispute whether DVUSA's termination itself was based on a line-make discontinuation.  Docket No. 59, p. 12 n. 3. Both of these material factual disputes prove to the court that defendants are not entitled to judgment as a matter of law under FED. R. CIV. P. 12(c).  These are non-speculative material factual disputes which bar defendants' motion for judgment on the pleadings.  Thus, defendants' motion as to Floyd's Rapid City's claim under South Dakota law is denied.

**B.    Floyd's Belgrade's Claims**

Floyd's Belgrade asserts that DVUSA and MBUSA violated Mont. Code. Ann. § 61-4-205(1) when they allegedly terminated their service agreement without good cause and seek injunctive relief and damages.  See Docket No. 1. Defendants argue Floyd's Belgrade's claim should be dismissed because it lacks standing to sue pursuant to Mont. Code. Ann. § 61-4-205(1) and the claim is moot because DVUSA has not terminated the parties' relationship. Docket No. 45, p. 10.

"Article III of the Constitution limits the jurisdiction of federal courts to deciding only 'Cases' or 'Controversies.' " Brazil v. Ark. Dep't. of Hum. Services,

892 F.3d 957, 959 (8th Cir. 2018) (citing U.S. Const. art. III, § 2 cl. 1).  The

requirement that a party have "standing" to bring suit is rooted in the

limitation of federal judicial power to cases and controversies.  Spokeo, Inc. v.

Robins, 578 U.S. 330, 337-38 (2016).

To have standing to bring suit, a "plaintiff must have (1) suffered an

injury in fact, (2) that is fairly traceable to the challenged conduct of the

defendant, and (3) that is likely to be redressed by a favorable judicial

decision."  Id. at 338 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-

61 (1992)).  When a statute is at issue, as here, "[t]he question is whether the

statute grants the plaintiff the cause of action that [they] assert."  Bank of Am.

Corp. v. City of Miami, Fla., 581 U.S. 189, 196-97 (2017).

The court "presume[s] that a statute ordinarily provides a cause of action

'only to plaintiffs whose interests fall within the zone of interests protected by

the law invoked.' "  Id. at 197 (quoting Lexmark Intern., Inc. v. Static Control

Components, Inc., 572 U.S. 118, 129 (2014)).  "Whether a plaintiff comes

within the zone of interests is an issue that requires [the court] to determine,

using traditional tools of statutory interpretation, whether a legislatively

conferred cause of action encompasses a particular plaintiff's claim."  Id.

(internal quotations omitted).

Montana Code Annotated § 61-4-205(1) states, in relevant part, that "a

franchisor may not cancel, terminate or refuse to continue a franchise unless

the franchisor has cause for termination or noncontinuance."  Standing to sue

under § 61-4-205(1) is provided by Mont. Code. Ann. § 61-4-217, which

authorizes only a "new motor vehicle dealer . . . a transferee of a new motor vehicle dealer . . . [and] any corporation or association that is primarily owned by or composed of new motor vehicle dealers" to file suit.  A "new motor vehicle dealer" is defined as:

> A person who buys, sells, exchanges, or offers or attempts to negotiate a sale or exchange or any interest in or who is engaged in the business of selling new motor vehicles under a franchise with the manufacturer of the new motor vehicles or used motor vehicles taken in trade on new motor vehicles.

See Mont. Code. Ann. § 61-4-201(14).

Floyd's Belgrade asserts it is a "new motor vehicle dealer" because it buys, sells, and services Freightliner trucks at its dealership.  Docket No. 59, p. 17.  Floyd's Belgrade also asserts it has a franchise with a subsidiary of defendants, Daimler Trucks North America LLC, to sell Freightliner trucks.  Id. But § 61-4-201(14) is clear that to be a "new motor vehicle dealer," one must be "engaged in the business of selling new motor vehicles *under a franchise* with the manufacturer of the new motor vehicles."  Mont. Code. Ann. § 61-4-201(14) (emphasis added).

Floyd's Belgrade's claims are against DVUSA and MBUSA, *not* their subsidiary Daimler Trucks North America.  Floyd's Belgrade's agreement with DVUSA only granted it authorization to *service* vehicles, *not* buy or sell them. See Docket No. 47-2.  The agreement states that "this [a]greement is not a contract, agreement, franchise or dealer agreement authorizing [Floyd's Belgrade] to sell new Freightliner Vans Commercial Vehicle products and is not a 'motor vehicle dealer' as set forth under applicable New York law."  Docket

24

No. 47-2, ¶ 21.  The agreement also states that "[Floyd's Belgrade] does not, by this Agreement, acquire any rights to engage in the sale of new Mercedes-Benz or Freightliner passenger vehicles or commercial vehicles."  Id. ¶ 22.

Under this agreement, Floyd's Belgrade does not have a franchise to "[sell] new motor vehicles under a franchise" with DVUSA or MBUSA with regard to the Sprinter line-make or any other vehicle.  In fact, Floyd's Belgrade concedes that their agreement only authorized them to "service Sprinter vehicles and sell parts and accessories."  Docket No. 59, p. 18.  Thus, Floyd's Belgrade lacks standing to assert a claim under Mont. Code. Ann. § 61-4-217.

Floyd's Belgrade asserts that even if it lacks standing, its claim should be dismissed without prejudice, and it should be granted leave to amend the complaint.  Docket No. 59, p. 18.  Defendants assert that any amendment to the complaint "would be futile" and should therefore not be entertained. Docket No. 69, p. 10.

"Dismissal for lack of jurisdiction is not an adjudication of the merits, thus the case must be dismissed without prejudice."  Missouri Soybean Ass'n v. U.S. E.P.A., 289 F.3d 509, 513 (8th Cir. 2002) (citing In re Hall, Bayoutree Ass'n, Ltd., 939 F.2d 802, 804 (9th Cir. 1991)).  But a court can dismiss a case with prejudice where "it is plainly unlikely that the plaintiff will be able to cure the standing problem."  Fieldturf, Inc. v. S.W. Recreational Indus., Inc., 357 F.3d 1266, 1269 (Fed. Cir. 2004) (internal quotations omitted); see also Smith v. Barnett, No. 4:20-cv-04066, 2020 WL 6205760, at *10 (D.S.D. Oct. 22, 2020).

25

Under Mont. Code Ann. § 61-4-201(14), it is clear Floyd's Belgrade is not a "new motor vehicle dealer" pursuant to its agreement with the defendants. While Floyd's Belgrade may be a "new motor vehicle dealer" with regard to other manufacturers, it is only authorized to service Freightliner vehicles with DVUSA, not buy or sell them. See Docket No. 47-2.

The court finds it unlikely that Floyd's Belgrade will be able to cure the standing issue through amending its complaint, but the court is equally cognizant that it is not privy to all the facts in possession of the parties. In addition, plaintiffs have not provided the court with any proposed amended complaint at this point. The court will dismiss Floyd's Belgrade's claim without prejudice and decide later, if the opportunity is presented, whether a specific proposed amendment should be granted. Floyd's Belgrade will have to demonstrate in any amendment proffered that it is a "new motor vehicle dealer" with regard to Sprinter line-make vehicles with the named defendants, not that it is a "new motor vehicle dealer" in general or with regard to other line-makes of vehicles or other manufacturers.

Defendants also argue that DVUSA has not terminated their agreement with Floyd's Belgrade and have "committed to doing business with it through at least 2026." Docket No. 69, p. 11. DVUSA sent a letter to Floyd's Belgrade on October 25, 2021, stating that their 2018 service provider agreement was set to expire in July 2021, but it was extended to October 2021. Docket No. 47-3. The letter then indicated that the agreement would be extended through December 31, 2021, at which time the 2018 agreement will "be terminated due

26

to the discontinuation of the Freightliner Sprinter," and Floyd's Belgrade will be authorized to continue to service vehicles under the 2018 agreement from January 1, 2022, until December 31, 2026.  Id.

The court need not decide this issue because Floyd's Belgrade lacks standing.  It is not a "new motor vehicle dealer" under its agreement with the defendants pursuant to Mont. Code. Ann. § 61-4-201(14).  Accordingly, the court dismisses Floyd's Belgrade's claim premised on Montana law without prejudice.

## CONCLUSION

Based on the foregoing facts, law, and analysis, it is:

ORDERED that defendants' motion for judgment on the pleadings [Docket No. 44] is DENIED as to Floyd's Rapid City's claim.  It is further

ORDERED that defendants' motion for judgment on the pleadings is GRANTED as to Floyd's Belgrade's claim.  The claim asserted by Floyd's Belgrade premised on Montana law is hereby dismissed without prejudice.

DATED this 11th day of May, 2023.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge